UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
v. : CR 02-29 T
:
JOHN GRAY :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) and 18 U.S.C. § 3401(i) for proposed findings of fact concerning whether Defendant John Gray ("Defendant") is in violation of the terms of his supervised release and, if so, for a recommended disposition. In compliance with that directive and in accordance with 18 U.S.C. § 3583(e) and Fed. R. Crim. P. 32.1, a hearing was conducted on September 1, 2005. For the reasons stated herein, I find that Defendant has violated the terms of his supervised release, and I recommend that he be sentenced to twenty-four (24) months imprisonment for that violation.

**I. Background**

On September 13, 2002, Defendant, after having previously pled guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), was sentenced by the Honorable Ernest C. Torres, Chief U.S. District Judge, to twenty-seven months imprisonment to be followed thirty-six months supervised release. A $100 special assessment was imposed. Supervised release commenced on April 6, 2004, with an expiration date of April 5, 2007. This supervised release was modified by the court on June 1, 2005, to include outpatient substance counseling and testing. Supervision was again modified by the court on July 14, 2005, to include outpatient mental health treatment.

On August 16, 2005, Supervising U.S. Probation Officer Kurt

E. O'Sullivan ("USPO O'Sullivan") filed a Petition for Warrant for Offender under Supervision (the "Petition"). On August 17, 2005, USPO O'Sullivan filed an Amended Petition for Warrant for Offender Under Supervision (the "Amended Petition"), alleging that Defendant had violated one standard condition and condition #7 of supervised release.

## II. The Alleged Violations

The Supervised Release Violation Report dated August 16, 2005 (the "Report"), filed in connection with the Amended Petition alleges that Defendant violated the following conditions of supervision in the manner indicated:

**A. Standard Condition: While on supervision, Defendant shall not commit another federal, state, or local crime.**

On August 13, 2005, Defendant was arrested by members of the Providence, Rhode Island, Police Department for possession of a firearm without a valid license and possession of a firearm after conviction of a crime of violence.

**B. Condition #7: Defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substance, except as prescribed by a physician.**

On May 25, 2005, May 31, 2005, June 20, 2005, June 29, 2005, July 6, 2005, July 7, 2005, and July 11, 2005, Defendant tested positive for marijuana. He also admitted to the use of cocaine on or about June 29, 2005, and July 6, 2005.[1]

## III. Travel

On August 16, 2005, Chief Judge Torres ordered the issuance

[1] At the hearing on September 1, 2005, the Government withdrew the alleged use of cocaine by Defendant as a ground for the instant violation. See Tape of 9/1/05 hearing.

of a warrant for Defendant to appear to answer to the Petition. On August 17, 2005, Defendant appeared before this Magistrate Judge. At that time Defendant was informed of the grounds for the alleged violation as stated in the Amended Petition. Defendant requested a hearing, which was scheduled for August 25, 2005, at 10:00 a.m. At the August 25, 2005, hearing, counsel for Defendant sought a continuance of one week. The court granted this request, and the hearing was rescheduled for September 1, 2005.

## IV. The Violation Hearing

### A. Evidence Presented

The Government presented two witnesses in support of the Amended Petition, each testifying as to a different ground for the alleged violation. The first was Providence Police Patrolman Thomas J. Zincone, Jr. ("Officer Zincone"). He testified on direct examination to the following. On August 13, 2005, at approximately 3:00 a.m., he and his partner were on routine patrol in an unmarked police car in the vicinity of the Lockwood Housing Development. Officer Zincone observed a gold car in a parking lot between West Clifford and Point Streets. A group of people (whom Officer Zincone described as "numerous subjects") was standing at the rear of this vehicle. He drove towards the gold car, stopping his police car at the entrance to the parking lot which had a chain across it. At this point, Officer Zincone's police car was directly in front of and perpendicular to the gold car. See Government Exhibit ("Ex.") 1 (Diagram drawn by Officer Zincone at 9/1/05 hearing).[2] Because the parking lot had a higher elevation than the street on which the police car stopped, the police officers were able to observe beneath the undercarriage of the gold car in the illumination provided by the headlights and spotlight of their police vehicle.

[2] A copy of Exhibit 1 is attached to this Report and Recommendation.

As he drove up, Officer Zincone recognized some of the subjects in the group, including Defendant, Fennell Brown (phonetic spellling), Jovanni Ciprion (phonetic spelling), and Kevron Poston. Officer Zincone observed Defendant walk from the group to the driver's side of the gold car. This was the side furthest from the police officers.[3] Officer Zicone noticed that Defendant had something in his right hand. When Defendant got to the spot marked with the letter A on the diagram (Ex. 1), Officer Zincone saw an object fall to the ground and Defendant kick it. The object landed near the rear tire of the gold car. At this time, Defendant was the only person behind the car and the only person who had moved from the group. Officer Zincone asked his partner if he had seen "that," and his partner responded that he had.

As the police officers got out of their vehicle to approach Defendant, several individuals attempted to block the officers by throwing up their hands and saying "check me, check me." The officers passed by these individuals and proceeded to where Defendant was standing. Officer Zincone bent down and, using his flashlight, observed the object on the ground. It was a yellowish colored sock with the handle of a pistol protruding from it. Officer Zincone made a hand gesture to his partner, indicating that the object was a gun, and then retrieved it. Upon examining the sock, he determined that it contained a small caliber hand gun. Officer Zincone testified that the gun, which was later test-fired and determined to be operable, was a .38 caliber Smith & Wesson snub nose revolver. It had not been reported stolen.

During cross examination, Officer Zincone testified that there were no females in the group prior to Defendant being

[3] At the violation hearing, Officer Zincone testified that Defendant walked "behind" the gold car. It is clear from the diagram which Officer Zincone drew (Ex. 1) that by "behind" Officer Zincone meant that Defendant walked to the driver's side of the gold car.

arrested, although after he was arrested some females were present. Officer Zincone acknowledged that there was nothing in the written statement which he prepared concerning the incident indicating that the parking lot had a higher elevation than the street or that individuals had attempted to block the officers.

On re-direct examination, Officer Zincone testified that after Defendant was arrested Fennell Brown (phonetic spelling) yelled at Jovanni Ciprion (phonetic spelling), a juvenile, that he "better speak up, you better tell them." Tape of 9/1/05 hearing. Officer Zincone understood these statements to mean that Brown wanted Ciprion to say that the gun belonged to him. Brown was bigger than Ciprion, and Officer Zincone was concerned about what would happen if the police left Ciprion with Brown. Officer Zincone separated Ciprion from Brown and spoke with him. Ciprion told Officer Zincone that the gun did not belong to him.

The Government's second witness was U.S. Probation Officer David Borrelli ("USPO Borrelli"). USPO Borrelli testified that he was Defendant's probation officer, that Defendant's supervised release had begun on April 6, 2004, and that as a condition of supervised release Defendant was required to refrain from the use or possession of controlled substances unless prescribed by a physician. USPO Borrelli further testified that Defendant had tested positive on May 25, 2005, May 31, 2005, June 20, 2005, June 29, 2005, July 6, 2005, July 7, 2005, and July 11, 2005, for marijuana use.

On cross examination USPO Borrelli testified that Defendant's mother had died prior to the violations alleged in the Amended Petition and that Defendant had reported that his younger sister had been removed from Rhode Island to Maryland without his knowledge.[4] Defendant also told USPO Borrelli that

---

[4] Defense counsel referred to Defendant's sister as being nine years old. USPO Borrelli indicated that he did not know her exact age.

his use of marijuana was related to the problems in his personal life, and he requested USPO Borrelli's assistance. In response, USPO Borrelli suggested that they seek a modification in the conditions of his supervised release to include a condition that Defendant participate in substance abuse counseling.[5] Defendant participated in this counseling. After several more positive drug test results, Defendant requested mental health treatment. Defendant's conditions of supervised release were again modified to include a requirement of outpatient mental health treatment.[6] USPO Borrelli was unable to recall if such mental health treatment was provided to Defendant. Following USPO Borrelli's testimony, the Government rested.

The defense called four witnesses. The first was Kevron Poston, age sixteen. Mr. Poston, who was represented by Attorney William A. DiMitri, Jr., asserted his privilege against self-incrimination to essentially all questions pertaining to the August 13, 2005, incident on both direct and cross examination. He was then excused.

The second defense witness was Mary James. She testified that Defendant was her boyfriend and had been so for approximately one year, although she had known him for five years. Ms. James stated that she was employed and had been with her present employer for one year. Defense counsel attempted to question Ms. James about a conversation which she had with Kevron Poston, but the Government objected on grounds of hearsay. The court sustained these objections. Ms. James was then excused.

The third witness, Gina Lawrence, testified as follows. She

---

[5] This modification was requested by the Probation Department on May 31, 2005, and approved by Chief Judge Torres on June 1, 2005. See Request for Modifying the Conditions or Term of Supervision with Consent of the Offender (Doc. #20).

[6] This second modification was requested by the Probation Department on July 14, 2005, and approved by Chief Judge Torres on that same date. See Request for Modifying the Conditions or Term of Supervision with Consent of the Offender (Doc. #21).

resides at 245 Lockwood Street, Apartment A, which is very close to the parking lot where Defendant was arrested. She has known Defendant for about seven years. Around 3:00 a.m. on August 13, 2005, she and her friend, Julia Mitchell, were at the parking lot. They were having a conversation with Defendant, who was seated inside the gold car which belonged to him. Ms. Lawrence was asking Defendant to give her a ride to the Dunkin Donuts on Eddy Street so that she could get some "ice coffee." As they spoke, a police car approached the parking lot. The police officers got out and searched a person who was unknown to Ms. Lawrence.

The police then went to Defendant's car, and one of the officers searched the front of the passengers' compartment. After the search, Defendant was told by the officers that he could leave. As he drove off, something fell off the car. The police ordered Defendant to stop, removed him from the car, and arrested him. Ms. Lawrence concluded her direct testimony by stating that Defendant had been in his car the entire time, apparently meaning that he was in his car when the police car arrived and remained inside until he was directed by the officers to exit it.

On cross examination, Ms. Lawrence testified that she had known Defendant's mother for seven years and that is how she came to know Defendant. On that night, she and Ms. Mitchell had gone to a local club in Ms. Mitchell's car. After leaving the club, they drove to the parking lot near Ms. Lawrence's residence and left Ms. Mitchell's car there. This lot was "next door" to the parking lot where Defendant's car was located. She and Ms. Mitchell had been speaking with Defendant for only a few minutes when the police car drove up to the lot.

Ms. Lawrence testified that she believed that Defendant stayed in his car while the police searched it but also stated that she was "not too sure" about this fact. She testified both that the object fell off Defendant's car immediately prior to his

starting the engine and that it fell off immediately after Defendant began to drive off.

The fourth and final witness called by the defense was Julia Mitchell. Ms. Mitchell testified that she knew Defendant and had been friends with his mother for seven or eight years. On the night of August 13, 2005, she and Ms. Lawrence had been at a club. After leaving the club, they went directly to Ms. Lawrence's parking lot. When they arrived at that location, they heard a lot of commotion "around the corner." Investigating the source, they saw a "bunch of guys" laughing and joking in a nearby parking lot. Defendant was in the parking lot, seated in his car, a gold Buick.

Ms. Mitchell and Ms. Lawrence went to the driver's side of Defendant's vehicle and began to speak to him. They wanted him to take them to Dunkin Donuts. In response to a question about why they were asking Defendant for a ride to Dunkin Donuts when she had her own vehicle, Ms. Mitchell testified that she did not want to drive because she had been "driving all night like from the bars ...." Tape of 9/1/05 hearing.

After only two or three minutes of conversing with Defendant, the police arrived. Upon being shown the diagram drawn by Officer Zincone (Ex. 1), Ms. Mitchell disputed that the police car was perpendicular to Defendant's car. She indicated that the police car was angled more towards the left. Ms. Mitchell also stated that the location where she and Ms. Lawrence were standing was marked on the diagram by the letter "A."

Ms. Mitchell recounted that the police pulled Defendant out of his car and that one officer then searched Defendant while the other officer searched the front of his car. They did not find anything. Defendant got back into the car. As Defendant started to drive off, a sock fell off the rear tire. Ms. Mitchell stated that the sock had not been there when Defendant was out of the car. She also testified that Kevron Poston was among the persons present.

On cross examination, Ms. Mitchell acknowledged that she and Ms. Lawrence had together met with Defendant's attorney and that he had read aloud to them the police officer's statement regarding the incident.

Ms. Mitchell corroborated Ms. Lawrence's testimony that the police searched another individual before they approached Defendant. Ms. Mitchell believed that this individual was Kevron Poston. She stated that Mr. Poston had called out that he did not have anything when the police arrived and that the police should search him.

Regarding the search of Defendant's vehicle, Ms. Mitchell stated that the police searched only the front of Defendant's vehicle. She testified that the sock fell from the top of the rear tire on the driver's side and that she saw it fall. She was also positive that the sock was not there when Defendant was outside the vehicle.

**B. Standard of Proof**

In determining whether Defendant has committed the violations of supervised release alleged in the Amended Petition the court applies a preponderance of the evidence standard. See 28 U.S.C. § 3583(e)(3); see also United States v. Goad, 44 F.3d 580, 585 (7th Cir. 1995)("To revoke a defendant's supervised release under 18 U.S.C. § 3583(e)(3), the district court must find by a preponderance of the evidence that the defendant violated the terms of his supervised release.").

**C. Discussion of Evidence**

**1. Commission of New Offense**

In deciding what weight to give to the testimony of each witness who testified regarding Defendant's arrest on August 13, 2005, the court considers the following factors: 1) the manner in which the witness responded to questions both on direct and on cross examination; 2) the demeanor of the witness on the stand; 3) the plausibility of the testimony offered; and 4) the interest

or lack of interest of the witness in the proceedings.

I find that Officer Zincone testified in a forthright manner. He was equally cooperative in responding to questions from defense counsel as in responding to questions from the prosecutor. He acknowledged certain facts which defense counsel sought to bring out. When Officer Zincone would not agree that a fact was as stated in defense counsel's question, he did so in a non-argumentative manner. When given the opportunity to explain why he would not agree, his explanations seemed reasonable. Overall, the court found his testimony to be plausible. Although Officer Zincone stated that he knew Defendant, no evidence was presented that he has an interest in this case or a bias or prejudice against Defendant.

I find that the testimony of Kevron Poston and Mary James has virtually no value in determining whether Defendant possessed the firearm on August 13, 2005. Mr. Poston asserted his privilege against self-incrimination to virtually all substantive questions regarding that matter. Ms. James was permitted to testify only that she had one or more conversations with Mr. Poston and not as to the substance of those conversations.

Ms. Lawrence's manner of testifying was not the same on cross examination as on direct examination. When the prosecutor sought to elicit details from her regarding what she and Ms. Mitchell had done in the hours and minutes preceding Defendant's arrest, a time period which was still relatively recent, her vagueness and professed lack of memory conveyed the impression that she was being deliberatively evasive to avoid giving testimony contrary to the testimony which Ms. Mitchell, who had been sequestered, might give. At times, Ms. Lawrence appeared needlessly to repeat the prosecutor's questions as if she were attempting to gain time to decide how she should answer. Her demeanor on the stand frequently suggested to the court that she was attempting to gauge whether the answer to a particular

question would help or hurt Defendant. Her answers regarding the sequence of events were inconsistent, and there were instances when she appeared to realize the conflict created by her prior statements and quickly altered her testimony. She was not as cooperative in responding to the prosecutor's questions as she was in answering those posed by defense counsel.

Overall Ms. Lawrence's testimony did not seem plausible. She claimed that the purpose of her conversation with Defendant was to ask him to give her a ride to Dunkin Donuts, but she and Ms. Mitchell had just left Ms. Mitchell's car in a nearby parking lot and presumably could have used it for that purpose. Her testimony that the police officer searched the front of the car while Defendant was still seated in the vehicle was highly implausible. Conducting a search in such a manner would be highly inefficient as Defendant's body would obstruct areas to be searched. It would also be dangerous as it would place the officer in a vulnerable position relative to Defendant.

Ms. Mitchell's manner of testifying and her demeanor on the stand was better than that of Ms. Lawrence. However, Ms. Mitchell's testimony was similarly implausible. Her explanation for not using her own vehicle to drive to Dunkin Donuts, namely that she had been "driving all night," Tape of 9/1/05 hearing, was at odds with her other testimony. Prior to being at the club, Ms. Mitchell said that she and Ms. Lawrence were at the Dunkin Donuts on Broad Street. Ms. Mitchell testified that they drove directly from the club to the parking lot near Ms. Lawrence's apartment. Given the early morning hour and the distances involved, these trips could have taken only a few minutes. Thus, Ms. Mitchell's claim that she had been "driving all night," even as a figure of speech, is not credible.[7] Thus,

[7] Ms. Mitchell stated that she had been "driving all night like from the bars ...," Tape of 9/1/05 hearing, but she testified about going only to one club. Ms. Lawrence was uncertain as to whether they had gone to more than one club (a point which the court found

her explanation for not using her own vehicle to go to Dunkin Donuts is not convincing.

Equally implausible, if not more so, was Ms. Mitchell's claim that she saw the sock fall from the top of the rear tire of Defendant's car as he started to drive off. There would be no reason for Ms. Mitchell to have her attention directed to the rear tire of Defendant's car when he allegedly started to drive away. Without such attention, it strains credulity that she would be able to determine the precise location from which the sock fell. The most that people in such a situation would likely be able to say is that as the car started to move something fell to the ground, but that they were unable to pinpoint the location (e.g. trunk, fender, bumper, tire, etc.) from which the object came.

Ms. Mitchell was also adamant that the sock was not on the tire when Defendant was being searched outside the car. There again would be no reason for Ms. Mitchell to notice at this point the absence of a sock on top of the rear tire. It is also highly improbable that anyone would place the sock on the tire during the short span of time between Defendant allegedly being told by the police that he could get back in his car and Defendant beginning to drive off. According to Ms. Mitchell's account, at least one of the police officers would have been standing next to Defendant's vehicle at this point. Thus, a person placing the gun on the tire would have had to do so in the span of a few seconds, in the presence of the police officers, and with the knowledge that the weapon was going to fall off as soon as the car moved, thereby alerting the officers to its presence. While the court can accept that an individual might wish to avoid being found with a gun in his possession, the scenario required to

---

troubling given that little more than two weeks had passed). In any case, even if the women went to more than one club, the court's observation about the travel times and distances involved remains valid.

credit Ms. Mitchell's testimony strains credulity.

Ms. Mitchell's testimony also conflicted with Ms. Lawrence's testimony in some respects. Ms. Mitchell testified that she picked Ms. Lawrence up at her apartment, while Ms. Lawrence testified that she walked to Ms. Mitchell's apartment. Although Ms. Mitchell stated that the police took Defendant out of the car prior to searching it, Ms. Lawrence testified that Defendant remained in the car. Indeed, Ms. Lawrence emphasized that Defendant did not get out of the car prior to being pulled from it after the gun fell off the tire.

Lastly, Ms. Mitchell is not a disinterested person. She knows Defendant and stated that she had been friends with his mother for seven or eight years. She is also friends with Ms. Lawrence.

For the reasons stated above, I give greater weight to the testimony of Officer Zincone than I do to the combined testimony of Mr. Poston, Ms. James, Ms. Lawrence, and Ms. Mitchell. Accordingly, I find that the Government has proved by a preponderance of the evidence that Defendant illegally possessed a firearm on August 13, 2005.

**2. Use of Marijuana**

Defendant offered no evidence to contradict the testimony of USPO Borrelli that Defendant tested positive for marijuana use on the dates alleged in the Amended Petition. Thus, Defendant has not contested this ground for violation (although he did elicit testimony from USPO Borrelli which was apparently for the purpose of explaining or mitigating this particular violation). Accordingly, I find that this violation has been proven by more than a preponderance of the evidence.

**D. Sentencing Recommendations**

The Government recommended that Defendant receive the statutory maximum of twenty-four months imprisonment. In support of this recommendation, the Government cited the fact that the

new offense was the same as the prior offense for which Defendant had received the period of supervised release. Defense counsel asked the court to impose a lesser period of imprisonment, noting that Defendant had experienced significant problems in his personal life and that he had sought help from the probation officer in attempting to deal with those problems.

Defendant was given the opportunity to address the court personally on the issue of sentencing, and he did so. Defendant denied that he possessed a firearm on August 13, 2005, and indicated his disagreement with the court's credibility findings. Defendant stated that he had sought assistance from his probation officer regarding his use of marijuana and that between July 13, 2005 (the date of his last positive drug test), and August 13, 2005, his urine specimens were clean.

## V. Sentencing Law

### A. Statutory Provisions

Section 3583(e)(2) of Title 18 of the United States Code ("U.S.C.") provides that if the court finds a defendant to be a violator of the conditions of supervised release, the court may extend the term of supervised release if less than the maximum authorized term was previously imposed and may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Fed. R. Crim. P. relating to the modification of probation and the provisions applicable to the initial setting of the terms and conditions of post-release supervision. In this case, the maximum term of supervised release was previously imposed. Therefore, the term cannot be extended.

Pursuant to Section 3583(e)(3) of Title 18 of the U.S.C., the court may, after considering certain statutory factors set

forth in § 3553(a),[8] revoke a term of supervised release and

---

[8] The § 3553(a) factors to be considered in imposing a sentence are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> ....
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> ....
>
> (4) the kinds of sentence and the sentencing range established for—
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>
> (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
> (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
>
> (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
>
> (5) any pertinent policy statement—
>
> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, if the court, pursuant to the Fed. R. Crim. P. applicable to revocation of supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release. However, a defendant whose term is revoked under this paragraph may not be required to serve more than two years in prison if the offense that resulted in the term of supervised release was a class C felony. Here the offense was a class C felony. Thus, the maximum period of imprisonment which may be imposed for the violation is two years.

Section 3583(h) of Title 18 of the U.S.C. provides that when a term of supervised release is revoked and the defendant is required to serve a term of imprisonment that is less than the maximum term of imprisonment authorized under subsection (e)(3), the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release (here three years), less any term of imprisonment that was imposed upon revocation of supervised release. See id.

---

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553(a) (2004).

**B. Guidelines**

Section 7B1.1 of the United States Sentencing Guidelines ("U.S.S.G.") provides for three grades of violations. Section 7B1.1(a) of the U.S.S.G. states that a Grade A violation consists of (A) conduct which is punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); or (B) any other offense punishable by a term of imprisonment exceeding twenty years. Conduct consisting of any other offense punishable by a term of imprisonment exceeding one year constitutes a Grade B violation. Conduct constituting an offense punishable by a term of imprisonment of one year or less, or violation of any other condition of supervision, is classified as a Grade C violation. Section 7B1.1(b) provides that where there is more than one violation, or the violation includes more than one offense, the grade of violation is determined by the violation having the most serious grade. In this case, Defendant has committed a Grade B violation because his possession of the firearm is punishable by a term of imprisonment exceeding one year. It is not a Grade A violation because the firearm is not of a type described in 26 U.S.C. § 5845(a).

Pursuant to Section 7B1.3(a)(1) of the U.S.S.G., upon a finding of a Grade A or B violation, the court shall revoke supervision. Therefore, the court must revoke supervision since Defendant committed a Grade B violation.

Section 7B1.3(g)(2) of the U.S.S.G. provides that where supervised release is revoked and the term of imprisonment imposed is less than the maximum term of imprisonment imposable upon revocation, the court may include a requirement that the defendant be placed on a term of supervised release upon release

from imprisonment. The length of such term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release. See id. (citing 18 U.S.C. § 3583(h)). In this case, the authorized statutory maximum term of supervised release is three years. There has not been any term of imprisonment previously imposed for violations of supervised release. Therefore, the court may impose the above-noted statutory maximum, minus the term of imprisonment that is to be imposed for this revocation.

Pursuant to Section 7B1.4(a) of the U.S.S.G., the criminal history category is the category applicable at the time the defendant originally was sentenced to a term of supervision. In this instance, Defendant had a criminal history category of V at the time of sentencing. The Revocation Table contained in Section 7B1.4(a) of the U.S.S.G. provides that, for a Grade B violation with a criminal history category of V, an imprisonment range of eighteen to twenty-four months is warranted.[9] Section 7B1.5(b) of the U.S.S.G. states that, upon revocation of supervised release, no credit shall be given toward any term of imprisonment ordered for time previously served on post-release supervision.

**VI. Discussion Re Sentencing Recommendation**

There are three considerations which cause the court to conclude that a sentence at the high end of the guideline range should be imposed. First, the new offense is the same as the offense for which Defendant received the instant period of

---

[9] The Court of Appeals for the First Circuit has held that Chapter 7 policy statements (including §7B1.4) are advisory rather than mandatory. See United States v. Ramirez-Rivera, 241 F.3d 37, 40 (1st Cir. 2001); United States v. O'Neil, 11 F.3d 292, 302 n.11 (1st Cir. 1993).

supervised release (possession of a firearm by a felon). This indicates a blatant disregard for the requirements of the law. Especially disturbing is the fact that Defendant has again carried a handgun on the streets of the city during the early morning hours. The danger to the community posed by such conduct is obvious.

Second, Defendant has violated not one but two conditions of supervised release. In addition to possessing a firearm on August 13, 2005, he has repeatedly tested positive for marijuana use.

Third, the court has previously modified the conditions of supervision in an attempt to address Defendant's use of marijuana. Notwithstanding that modification, he continued to violate the condition that he not use or possess a controlled substance unless prescribed by a physician.

The court has considered the fact that Defendant sought assistance from the probation officer in dealing with his substance abuse and mental health issues. The court has also considered the problems which Defendant has experienced in his personal life. While these circumstances weigh in Defendant's favor, they are relevant only to the second ground of violation. Were that the only violation, the court would not recommend a sentence at the high end of the guideline range. However, there are two grounds for violation, and their combined gravity, even with the mitigating factors mentioned above, is such that a sentence of twenty-four months is appropriate.

**VII. Conclusion**

After considering the various factors set forth in 18 U.S.C. § 3553(a) and for the reasons expressed above, I recommend that Defendant be sentenced to twenty-four (24) months imprisonment. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of

its receipt. See Fed. R. Civ. P. 72(b); D.R.I. Local R. 32. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

David L. Martin

DAVID L. MARTIN
United States Magistrate Judge
September 9, 2005




GOVERNMENT EXHIBIT 1